# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **INNOVATION LAW LAB and LUIS JAVIER SANCHEZ GONZALEZ by XOCHITL RAMOS VALENCIA as next friend,**<br><br>Plaintiffs-Petitioners,<br><br>v.<br><br>**KIRSTJEN NIELSEN, Secretary, Department of Homeland Security; THOMAS HOMAN, Acting Director, Immigration and Customs Enforcement (ICE); ELIZABETH GODFREY, Acting Field Office Director, Seattle Field Office of ICE; JEFFERSON BEAUREGARD SESSIONS, III, U.S. Attorney General; HUGH J. HURWITZ, Acting Director, Federal Bureau of Prisons; JOSIAS SALAZAR, Warden, FCI Sheridan Medium Security Prison; in their official capacities only**,<br><br>Defendants-Respondents. | Case No. 3:18-cv-01098-SI<br><br>**OPINION AND ORDER GRANTING TEMPORARY RESTRAINING ORDER** |

Keith Ketterling and Nadia H. Dahab, STOLL STOLL BERNE LOKTING & SHLACHTER PC, 29 SW Oak St., Suite 500, Portland, OR 97204. Mathew W. dos Santos and Kelly K. Simon, ACLU FOUNDATION OF OREGON, INC., PO Box 40585 Portland, OR 97240. Of Attorneys for Plaintiffs-Petitioners.

Billy J. Williams, United States Attorney, and Dianne Schweiner, Assistant United States Attorney, UNITED STATES ATTORNEY'S OFFICE FOR THE DISTRICT OF OREGON, 1000 SW Third Avenue, Suite 600, Portland, OR 97204. Chad A. Readler, Acting Assistant Attorney General; William C. Peachey, Director; Jeffrey S. Robins, Assistant Director; and Ubaid ul-Haq, Trial Attorney, UNITED STATES DEPARTMENT OF JUSTICE, CIVIL DIVISION, OFFICE OF IMMIGRATION LITIGATION, PO Box 868, Ben Franklin Station, Washington, D.C. 20044. Of Attorneys for Defendants-Respondents.

Lisa Hay, Federal Public Defender, and Stephen R. Sady, Chief Deputy Federal Defender, FEDERAL PUBLIC DEFENDER'S OFFICE FOR THE DISTRICT OF OREGON, 101 SW Main Street, Suite 1700, Portland, OR 97204. *Amica Curiae*.

**Michael H. Simon, District Judge.**

We are a nation under law, and the rule of law is one of our most cherished values. The right to counsel, which allows a person to receive timely legal advice, is firmly entrenched in the concept of due process and protected by the Fifth Amendment against governmental interference. Further, this right is available to everyone in the United States, not just citizens or others who are here lawfully. In this case, Plaintiffs assert that the government is interfering with the rights of persons being civilly detained under our complex immigration laws from receiving the benefits of the right to counsel. No request is being made to provide legal counsel at taxpayer expense. The only relief sought is to enjoin the government from continuing to interfere with a civil immigrant detainee's right to counsel when there are volunteer attorneys, expert in immigration matters, ready, willing, and able to provide legal assistance without charge. For the reasons that follow, the Court grants the requested relief.

Plaintiffs Innovation Law Law ("Law Lab") and Luis Javier Sanchez Gonzalez, by Xochitl Ramos Valencia as next friend ("Sanchez Gonzalez") bring this action challenging the policies and practices related to immigrant detainees held at the Federal Detention Center in Sheridan, Oregon ("FDC Sheridan"). Defendants are officials with the U.S. Department of Homeland Security ("DHS"), U.S. Immigration and Customs Enforcement ("ICE"), the Federal

Bureau of Prisons ("BOP"), and the U.S. Department of Justice. Plaintiffs seek a temporary restraining order ("TRO") requiring Defendants to, among other things: (1) provide adequate attorney visitation and telephone access for immigrant detainees at FDC Sheridan; (2) permit Law Lab to conduct "know your rights" ("KYR") training for detainees; and (3) bar Defendants from proceeding with detainees' interviews, cases, or deportations until after the detainees have had a full and fair an opportunity meaningfully to consult with an attorney and attend KYR training conducted by Law Lab. On June 25, 2018, the Court held a hearing on Plaintiffs' motion. Plaintiffs' motion for TRO is granted.

**STANDARDS**

In deciding whether to grant a motion for TRO, courts look to substantially the same factors that apply to a court's decision on whether to issue a preliminary injunction. *See Stuhlbarg Int'l Sales Co. v. John D. Brushy & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001). A preliminary injunction is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 22 (2008). A plaintiff seeking a preliminary injunction generally must show that: (1) the plaintiff is likely to succeed on the merits; (2) the plaintiff is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in favor of the plaintiff; and (4) an injunction is in the public interest. *Winter*, 555 U.S. at 20 (rejecting the Ninth Circuit's earlier rule that the mere "possibility" of irreparable harm, as opposed to its likelihood, was sufficient, in some circumstances, to justify a preliminary injunction).

The Supreme Court's decision in *Winter*, however, did not disturb the Ninth Circuit's alternative "serious questions" test. *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131-32 (9th Cir. 2011). Under this test, "'serious questions going to the merits' and a hardship balance that tips sharply toward the plaintiff can support issuance of an injunction, assuming the

other two elements of the *Winter* test are also met." *Id.* at 1132. Thus, a temporary restraining order or a preliminary injunction may be granted "if there is a likelihood of irreparable injury to plaintiff; there are serious questions going to the merits; the balance of hardships tips sharply in favor of the plaintiff; and the injunction is in the public interest." *M.R. v. Dreyfus*, 697 F.3d 706, 725 (9th Cir. 2012) (citing *Cottrell*).

A temporary restraining order is necessarily of a shorter and more limited duration than a preliminary injunction.[1] Thus, the application of the relevant factors may differ, depending on whether the court is considering a temporary restraining order or a preliminary injunction.[2] Indeed, the two factors most likely to be affected by whether the motion at issue is for a TRO or a preliminary injunction are the "balancing of the equities among the parties" and "the public interest."

Finally, the already high standard for granting a TRO or preliminary injunction is further heightened when the type of injunction sought is a "mandatory injunction." *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (noting that the burden is "doubly demanding" for a mandatory injunction). To obtain a mandatory injunction, a plaintiff must "establish that the law

---

[1] The duration of a temporary restraining order issued without notice may not exceed 14 days but may be extended once for an additional 14 days for good cause; in addition, the reasons for such an extension must be entered in the record. Fed. R. Civ. P. 65(b)(2). When a temporary restraining order is issued with notice and after a hearing, however, the 14-day limit for such orders issued without notice does not apply. *See Horn Abbot Ltd. v. Sarsaparilla Ltd.*, 601 F. Supp. 360, 368 n.12 (N.D. Ill. 1984). Nevertheless, absent consent of the parties, "[a] court may not extend a 'TRO' indefinitely, even upon notice and a hearing." *Id.* Accordingly, unless the parties agree otherwise, a court should schedule a preliminary injunction hearing to occur not later than 28 days after the date that the court first issues a temporary restraining order.

[2] A preliminary injunction also is of limited duration because it may not extend beyond the life of the lawsuit. That is the role of a permanent injunction, which a court may enter as part of a final judgment, when appropriate. A preliminary injunction, however, may last for months, if not years, while the lawsuit progresses toward its conclusion.

and facts *clearly favor* her position, not simply that she is likely to succeed." *Id.* (emphasis in original). As explained by the Ninth Circuit:

> A preliminary injunction can take two forms. A prohibitory injunction prohibits a party from taking action and "preserve[s] the status quo pending a determination of the action on the merits." *Chalk v. U.S. Dist. Court*, 840 F.2d 701, 704 (9th Cir. 1988); *see also Heckler v. Lopez*, 463 U.S. 1328, 1333 (1983) (a prohibitory injunction "freezes the positions of the parties until the court can hear the case on the merits"). A mandatory injunction orders a responsible party to take action. A mandatory injunction goes well beyond simply maintaining the status quo [p]endente lite [and] is particularly disfavored. In general, mandatory injunctions are not granted unless extreme or very serious damage will result and are not issued in doubtful cases or where the injury complained of is capable of compensation in damages.
>
> The *status quo ante litem* referenced in *Chalk* means the last, uncontested status which preceded the pending controversy.

*Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 878-79 (9th Cir. 2009) (quotation marks and citation omitted) (alterations in original).

## FINDINGS OF FACT

Based on the evidence presented by the parties, the Court finds the following facts are more likely true than not:

1.      On May 31, 2018, ICE transferred 124 immigrant men to FDC Sheridan for civil detention. ECF 14-1 (Newman Decl.) ¶ 4. Approximately 121 immigrant detainees remain at that location. *Id.* The detainees are housed in two units, at least one of which also houses inmates of the federal prison *Id.* ¶ 6. According to Defendants, both social and legal visits currently take place each Monday through Friday from 8:30 until 11:30 a.m. for inmates and from 12:00 until 3:00 p.m. for immigrant detainees. *Id.* ¶ 8. Defendants add that by June 27, 2018, they intend to provide legal visitation for all pretrial/pre-sentence and civil detainees from 8:30 a.m. until 3:00 p.m, Monday through Friday, on a "first-come, first-served" basis. *Id.* Many of the

detainees have come to the United States to request asylum. *See, e.g.*, ECF 3 (Manning Decl.) ¶ 26; ECF 6 (Garcia Decl.) ¶ 5.

2.      Plaintiff Law Lab is a nonprofit organization that advocates on behalf of noncitizens in the United States. Law Lab seeks to provide KYR training sessions, which cover the immigration system and detainees' rights, to civil detainees at FDC Sheridan. Law Lab also seeks to provide legal representation without charge (pro bono) to every unrepresented civil detainee at FDC Sheridan who requests legal representation. Law Lab provides representation to noncitizens, in part, through its Oregon-based network of 125 private, pro bono attorneys who have been trained in asylum and removal defense. ECF 3 (Manning Decl.) ¶ 2.

3.      Stephen W. Manning ("Manning") is the Executive Director of Law Lab. Law Lab, through Manning, designed a pro bono representation project to facilitate access to, and legal representation of, the FDC Sheridan immigrant detainees. Law Lab's pro bono representation project seeks to provide a minimum of three attorney contacts with each detainee who requests legal representation, consisting of: (1) a KYR group orientation that provides an overview of immigration relief; (2) an individualized screening with a trained advocate; and (3) an individualized client conference. Law Lab determined that at least three know-your-rights orientations of 60 to 90 minutes duration is needed adequately to orient all interested FDC Sheridan immigrant detainees on their rights. *Id.* ¶ 8.

4.      On June 8, 2018, Manning established a hotline with a local telephone number to allow anyone detained as a civil immigrant detainee to call Law Lab for free legal assistance. *Id.* ¶ 12. The hotline number was provided to the immigrant detainees at FDC Sheridan by members of the Mexican Consulate who visited Mexican nationals at FDC Sheridan on June 14, 2018. *Id.* ¶ 14. Despite having been provided the toll-free number, detainees have not been able to place

free legal phone calls because free phone calls are not allowed by FDC Sheridan's telephone system. *Id.* ¶ 17.

5.      Also on June 8, 2018, Manning asked Philip Smith ("Smith"), a local immigration attorney, to provide pro bono legal representation for a detainee whose partner had asked Law Lab to represent the detainee. On Saturday, June 9, 2018, Smith called FDC Sheridan to arrange a meeting with his client, the detainee. Smith was told that attorney visits are normally permitted seven days a week and could be arranged through a counselor. Smith was further told that a counselor would be on duty on Sunday, June 10, 2018. Smith also left a telephone message with the person in charge of the unit where immigrant detainees were being held, in which he identified himself and provided his phone number and his client's identifying information. ECF 8 (Smith Decl.) ¶ 2-4.

6.      On Sunday, June 10, 2018, Smith traveled one and one-half hours to FDC Sheridan. Upon arrival at the visitation center, Smith identified himself as an immigration attorney and provided his client's identification information. FDC Sheridan security officers denied Smith entry, telling him that visits needed to be scheduled in advance and were permitted only Monday through Friday. The supervising security officer also said that an appointment for one of the three attorney visitation rooms was required, and that such appointments were available only Monday through Friday. Smith asked if he could meet with his client in the public visitation area and was told that he could not. Smith left without meeting his client. *Id.* ¶ 6-10.

7.      On June 14, 2018, Law Lab received referrals from Lisa Hay, the Federal Public Defender for the District of Oregon, for 13 FDC Sheridan immigrant detainees who had requested an immigration attorney. ECF 3 ¶ 15-16. An attorney who visited FDC Sheridan as

part of the visit of the Mexican Consulate also reported that each detainee with whom he had met had requested asylum relief and legal representation. ECF 6 (Garcia Decl.) ¶ 5, 11.

8.     Law Lab attorneys have continued to be denied access to civil immigrant detainees at FDC Sheridan. Permission that had been granted for a legal visit on Friday, June 15, 2018, was revoked on the morning of June 15 after Law Lab's legal team had already departed for FDC Sheridan. The legal team was told that the visit could occur only at some point later that evening, and that weekend access was also denied. ECF 3 ¶ 19-20 (Manning Decl.).

9.     While attempting to make arrangements for a legal visit on the next available non-weekend day, Monday, June 18, 2018, Manning was told that attorney visitation would be limited to a single room for three hours per day, Monday through Friday, that no immigration library materials were available, and that the free direct call platform was not, and had not been, operational. *Id.* ¶ 21.

10.    On Monday, June 18, 2018, Law Lab attorneys again had their permission to visit nine detainees revoked by FDC Sheridan at the last minute, despite earlier assurances that they could visit on that day. The attorneys were told by an ICE official that legal visitations would only occur on Tuesday, Wednesday, and Friday from 12:30 p.m. to 3:30 p.m. *Id.* ¶ 22.

11.    On Wednesday, June 20, 2018, attorney Chelsea Strautman visited FDC Sheridan to meet with immigrant detainees. ECF 9 (Strautman Decl.) ¶ 5. She identified herself as an attorney who was there to offer legal representation to immigrant detainees who requested access to counsel. *Id.* ¶ 3. ICE denied her access. *Id.* ¶ 5-6. On Thursday, June 21, 2018, Strautman and two other attorneys visited FDC Sheridan seeking to provide pro bono legal representation to immigrant detainees who had requested access to counsel through Law Lab's pro bono program.

These attorneys identified themselves as attorneys but were denied access. ECF 9 (Strautman Decl.) ¶ 7-8; ECF 7 (Philbaum Decl.) ¶ 5; ECF 5 (Baxter-Neal Decl.) ¶ 5.

12.     Shortly after 5:00 p.m. on June 21, 2018, two Law Lab lawyers returned to FDC Sheridan to present KYR training. A Law Lab attorney had confirmed the day before, with Defendant Elizabeth Godfrey, the Acting Field Office Director in the Seattle Field Office of ICE, that Law Lab's pro bono team was authorized to provide KYR training at FDC Sheridan from 4:45 p.m. to 8 p.m. on Tuesday, Wednesday, and Thursday. ECF 4 (Sinlapasai Decl.) ¶ 12. BOP officers at FDC Sheridan, however, turned away the attorneys and would not let them conduct their KYR training. ECF 7 (Philbaum Decl.) ¶ 10.

13.     At least 50 detainees have requested legal representation from Law Lab's pro bono project. ECF 3 (Manning Decl.) ¶ 25-27. Only one attorney associated with the project, however, has been able to meet with his client, and that client has since been transferred by ICE from FDC Sheridan to the North West Detention Center in Tacoma, Washington, outside of the District of Oregon. *Id.* ¶ 28.

14.     Plaintiff Sanchez Gonzalez is currently detained at FDC Sheridan. He is unable to file a complaint on his own due to lack of access to legal counsel. His domestic partner of ten years, Xochitl Ramos Valencia, has requested pro bono legal representation from Law Lab on his behalf. Law Lab attorneys have twice attempted to meet with Sanchez Gonzalez, including on June 21, 2018, but were denied access both times. *Id.* ¶ 33-34.

15.     "Credible fear" interviews for immigrant detainees seeking asylum are scheduled to begin at FDC Sheridan on June 28, 2018. ECF 14-2 (Heaton Decl.) ¶ 8.

16.     Removal proceedings for the 121 immigrant detainees at FDC Sheridan have not yet commenced. Further, none of these immigrant detainees have been served with an

administrative summons known as a "Notice to Appear," which is how a removal proceeding typically begins.

17.     On June 8, 2018, Chief Judge Michael W. Mosman of the U.S. District Court for the District of Oregon authorized the Federal Public Defender of Oregon to consult with the immigrant detainees at FDC Sheridan regarding the legality of their detention. ECF 18 at 8.

## CONCLUSIONS OF LAW

### A.  Subject Matter Jurisdiction

Defendants argue that the Immigration and Nationality Act ("INA"), as amended, removes subject matter jurisdiction from federal district courts and, thus, this Court has no jurisdiction over this action. This removal of subject matter jurisdiction, however, only applies to removal proceedings. Under 8 U.S.C. § 1252(b)(9) and 8 U.S.C. § 1252(a)(5), "claims that 'arise from' removal proceedings . . . must be channeled through the [petition for review] process." *J.E.F.M. v. Lynch*, 837 F.3d 1026, 1032 (9th Cir. 2016). In addition, when claims are "inextricably linked" to removal proceedings, they may not be heard by federal district courts. *Martinez v. Napolitano*, 704 F.3d 620, 623 (9th Cir. 2012). Such claims may only be raised before a federal circuit court on a petition for review ("PFR") of a final removal order. *J.E.F.M.*, 837 F.3d at 1032. Under 8 U.S.C. § 1252(g), federal courts also lack jurisdiction to hear challenges to the Attorney General's "decision or action to commence [removal] proceedings, adjudicate cases, or execute removal orders." *Reno v. American-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 482 (1999). "[C]laims that are independent of or collateral to the removal process," however, are excluded from the PFR process and, thus, may be heard in federal district courts. *Id.; see also Nadarajah v. Gonzales*, 443 F.3d 1069, 1075-76 (9th Cir. 2006) (holding that the district court had jurisdiction over a habeas corpus petition when the petition did not involve a final order of removal).

In *J.E.F.M.*, the Ninth Circuit held that the district court lacked subject matter jurisdiction over immigrant children's claims to court-appointed counsel because such claims arose from removal proceedings. 837 F.3d at 1033. The Ninth Circuit noted that such claims are "bound up in and an inextricable part of the administrative process." *Id.* The court also observed that the jurisdiction-stripping provisions of the INA were intended to "channel all claims arising from removal proceedings, including right-to-counsel claims, to the federal courts of appeals and bypass the district courts." *Id.*

Plaintiffs in the pending case, however, do not challenge the detainees' removal proceedings because formal removal proceedings have not commenced. Rather, Plaintiffs challenge ICE and BOP procedures and policies relating to the conditions of the civil immigrant detainees' pre-hearing confinement. *J.E.F.M.* did not address whether district courts have jurisdiction over constitutional claims by immigrant detainees whose removal proceedings have not yet commenced. In fact, the district court in *J.E.F.M.* had already dismissed all parties "against whom removal proceedings have not yet been initiated," explaining that their claims for court-appointed counsel in removal proceedings were not ripe because their "removal proceedings may never be commenced." *Id.* at 1030. The Ninth Circuit's ruling in *J.E.F.M.*, therefore, does not preclude this Court from hearing claims from civil immigrant detainees whose removal proceedings have not yet been initiated. *See also Jennings v. Rodriquez*, 138 S. Ct. 830, 840 (2018) (holding that 8 U.S.C. § 1252(b)(9) does not deprive a district court of jurisdiction to hear a challenge to an alien's indefinite detention, even when the purpose of the detention is to lead ultimately to removal proceedings).

Moreover, Plaintiffs request a TRO to protect each immigrant civil detainee's right to access attorneys pending their *asylum* proceedings. Although an alien's asylum status likely will

be relevant to the later question of removal, asylum proceedings, which are governed by 8 U.S.C. § 1158, are distinct from removal proceedings, which are governed by 8 U.S.C. § 1229a. The plain text of 8 U.S.C. § 1252(b)(9), 8 U.S.C. § 1252(a)(5), and the Ninth Circuit's holding in *J.E.F.M.* explicitly limits the mandatory PFR process to claims arising from removal proceedings. Thus, this Court has subject matter jurisdiction over Plaintiffs' claims, as presented in the pending motion.

Finally, even if Plaintiffs' claims were subject to the INA's jurisdiction-stripping provisions, there is a serious question as to whether it would be futile to require Plaintiffs to administratively exhaust their constitutional claims through the petition for review process. Administrative exhaustion is not required when exhaustion would be futile. *Albino v. Baca*, 747 F.3d 1162, 1172 (9th Cir. 2014). On June 24, 2018, President Donald J. Trump announced, with regard to undocumented immigrants, that "[w]hen somebody comes in, we must immediately, with no Judges or Court Cases, bring them back from where they came." The position of the United States Government appears to be that aliens are not entitled to due process in immigration proceedings.[3] There is, therefore, reason to believe that Plaintiffs' claims alleging due process violations are unlikely to be given a full and fair hearing before immigration judges who fall under the authority of the executive branch.

## B. Standing

Defendant argues that the requested TRO is overbroad because neither Gonzalez nor Law Lab has standing to litigate on behalf of other detainees at FDC Sheridan who are not parties to

---

[3] The Federal Government previously has taken the position that tweets from the Twitter account "@realDonaldTrump" are official presidential statements. *See James Madison Project v. Department of Justice, et al*, No. 1:17-cv-00144, Def. Supp. Mem. at 4 (ECF No. 29) (D.D.C. Nov. 13, 2017) ("[T]he government is treating the President's statements to which plaintiffs point—whether by tweet, speech or interview—as official statements of the President of the United States.").

this lawsuit. To bring an action on the behalf of third parties, however, "[t]he litigant must have suffered an 'injury in fact,' thus giving him or her a 'sufficiently concrete interest' in the outcome of the issue in dispute; the litigant must have a close relation to the third party; and there must exist some hindrance to the third party's ability to protect his or her own interests." *Powers v. Ohio*, 499 U.S. 400, 410-11 (1991).

Law Lab meets these requirements. Law Lab's stated mission is to advocate on behalf of and provide legal representation to noncitizens in the United States. In furtherance of this mission, they have undertaken considerable effort to provide pro bono legal representation to the FDC Sheridan immigrant detainees. The alleged policies, procedures, and actions at FDC Sheridan, however, have prevented Law Lab from fulfilling its mission of advocating on behalf of noncitizens, and render futile its efforts to coordinate pro bono legal representation. The challenged policies and procedures also have resulted in the diversion of Law Lab resources, as attorneys have repeatedly traveled to FDC Sheridan only to be turned away, and have established a toll-free hotline for detainees that detainees have not been able to access or use. Such facts sufficiently establish that Law Lab has suffered injury in fact.

Plaintiffs also have demonstrated that Law Lab has a sufficiently close relationship with the detainees to advocate on their behalf. Plaintiffs have submitted affidavits indicating that at least 50 detainees at FDC Sheridan have requested representation from Law Lab. The Federal Public Defender ("FPD"), as *amica curiae*, also states that at least 64 detainees have communicated their requests for immigration representation, which the FPD cannot provide, to FPD staff attorneys. ECF 18. These numerous requests from immigrant civil detainees and FDC Sheridan sufficiently demonstrate that Law Lab has a close relation to the detainees, even if Defendants' policies, practices, and actions have prevented Law Lab attorneys from formalizing

their legal relationship with many of those detainees. Finally, and perhaps most obviously, the circumstances of the detainees' confinement—specifically, the lack of access to immigration lawyers that forms the foundation of this case—poses a significant hindrance to the detainees' ability to advocate on their own behalf, as do the foreign language barriers faced by many of the civil detainees. Plaintiffs, thus, have established that they have standing in this case sufficient to request the relief they are seeking on a temporary or preliminary basis.

## C.  Analysis of Motion for Temporary Restraining Order

### 1.  Likelihood of Success on the Merits

Plaintiffs have shown a likelihood of success on the merits of their third claim, which alleges a violation of the Due Process Clause of the Fifth Amendment. The Court need not decide at this stage of the litigation whether Plaintiffs have shown a likelihood of success on the merits regarding their other constitutional and statutory claims.

The Due Process Clause of the Fifth Amendment guarantees to aliens the right to counsel at their own expense for immigration hearings. *See, e.g., Tawadrus v. Ashcroft*, 364 F.3d 1099, 1103 (9th Cir. 2004) ("Although there is no *Sixth Amendment* right to counsel in an immigration hearing, Congress has recognized it among the rights stemming from the *Fifth Amendment* guarantee of due process that adhere to individuals that are subject to removal hearings.") (emphasis added); *Colindres-Aguilar v. INS*, 819 F.2d 259, 261 n.1 (9th Cir. 1987) ("Petitioner's right to counsel . . . is a right protected by the fifth amendment due process requirement of a full and fair hearing.").

The right to counsel in immigration proceedings, including asylum proceedings, requires that an alien be provided "reasonable time to locate counsel and permit counsel to prepare for the hearing." *Biwot v. Gonzales*, 403 F.3d 1094, 1098 (9th Cir. 2005). The Ninth Circuit has upheld mandatory injunctions designed to remedy government practices when the "cumulative effect" of

such practices "was to prevent aliens from contacting counsel and receiving any legal advice." *Orantes-Hernandez v. Thornburgh*, 919 F.2d 549, 565 (9th Cir. 1990). Government practices that effectively deny access to counsel include the detention of aliens far from where potential or existing counsel was located, limited attorney visitation hours, and the processing of aliens at locations where telephones were not available to them. *Id.* at 565-67.

Plaintiffs have presented sufficient evidence of government practices at FDC Sheridan that are nearly identical to the enjoined practices at issue in *Orantes-Hernandez*. Attorneys associated with Law Lab's immigrant detainee representation project have been repeatedly denied access to FDC Sheridan either to perform KYR training or to meet with clients who have retained their services through friends and family. Officials at FDC Sheridan have given conflicting and nearly-impossible-to-follow instructions on the availability of legal visitation hours. *See also Nunez v. Bolden*, 537 F. Supp. 578, 582 (S.D. Tex. 1982) (holding that a detention facility regulation prohibiting attorney visits after 3:30 p.m. was unreasonably restrictive, given the remoteness of the detention facility).

As with the enjoined practices at issue in *Orantes-Hernandez*, the BOP and ICE attorney visitation policies and practices have the "cumulative effect" of denying detainees constitutionally sufficient access to legal assistance. Plaintiffs have demonstrated not only a likelihood of success on the merits of their Fifth Amendment due process claim, as required for prohibitory injunctions, but that "the law and facts *clearly favor* [their] position," as required to obtain a mandatory injunction. *Garcia*, 786 F.3d at 740 (emphasis added).

### 2. Irreparable Harm, Equities and Public Interest

Plaintiffs also have made a compelling demonstration that they are likely to suffer immediate irreparable harm in the absence of emergency relief. The Court has concluded that Defendants are likely violating the immigrant detainees' constitutional rights, and such violations

"unquestionably constitute[] irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). The harms likely to arise from the denial of access to legal representation in the context of asylum applications are particularly concrete and irreparable. The Ninth Circuit has repeatedly emphasized the complexity of immigration laws and procedures and the difficulty of navigating immigration proceedings without a lawyer. *See, e.g., Baltazar-Alcazar v. I.N.S.*, 386 F.3d 940, 948 (9th Cir. 2004). The denial of access to legal assistance is likely to lead to the denial of asylum and ultimately to the deportation of detainees with meritorious asylum claims. Early representation is particularly important in asylum claims, given the complexity of treaty-based human rights statutes and the serious harm—including persecution, torture, and death—that may result if asylum is improperly denied. *See Arizona v. United States*, 567 U.S. 387, 395 (2012) ("Federal governance of immigration and alien status is extensive and complex."); *Sessions v. Dimaya*, 138 S. Ct. 1204, 1213 (2018) (noting in the void-for-vagueness context the "grave nature of deportation," a "drastic measure" often amounting to lifelong "banishment or exile").

The equities in this case also tip sharply in favor of emergency relief. Plaintiffs request only that BOP and ICE actually provide the same degree of access to legal assistance that their own regulations purport to guarantee. Defendants, thus, cannot show that the requested TRO will pose an undue burden on their time, resources, or personnel. Moreover, any such burden on Defendants is more than justified by the need to ensure the fulfillment of Plaintiffs' constitutional rights and to prevent the improper denial of meritorious asylum applications. Finally, it is always in the public interest to prevent the violation of a party's constitutional rights.

### D. Voluntary Cessation Doctrine

Defendants also argue that the relief that Plaintiffs seek is moot because Defendants either have already addressed Plaintiffs' concerns or are taking steps to do so. The Supreme Court, however, has explained the voluntary cessation doctrine as follows:

> It is well settled that a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice. Such abandonment is an important factor bearing on the question whether a court should exercise its power to enjoin the defendant from renewing the practice, but that is a matter relating to the exercise rather than the existence of judicial power.

*City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 (1982). As the Supreme Court further explained:

> "The test for mootness in cases such as this is a stringent one. Mere voluntary cessation of allegedly illegal conduct does not moot a case; if it did, the courts would be compelled to leave '[t]he defendant . . . free to return to his old ways.' A case might become moot if subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur. . . . Of course it is still open to appellees to show, on remand, that the likelihood of further violations is sufficiently remote to make injunctive relief unnecessary. This is a matter for the trial judge. But this case is not technically moot[.]"

*Id.* n.10 (quoting *United States v. Concentrated Phosphate Export Ass'n*, 393 U.S. 199, 203-04 (1968) (alterations in original) (citations omitted); *see also Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000) (describing the voluntary cessation doctrine and citing to *City of Mesquite* and *Concentrated Phosphate*).

Defendants represent that beginning on June 27, 2018, they will allow attorneys to conduct legal visitation with immigrant detainees at FDC Sheridan Monday through Friday for six and one-half hours. Defendants imply that they likely will permit KYR presentations to begin on June 26, 2018. These presentations will take place outside of normal visitation hours to ensure

maximum attendance. Defendants also state that they have arranged for two dedicated telephone lines that the immigrant detainees may use to make free legal, consulate, or crisis calls.

"Credible fear" interviews for asylum applications, however, are scheduled to begin on June 28, 2018. As recently as June 22, 2018, none of Law Lab's attorneys had yet met with any immigrant detainee who are still located at FDC Sheridan. Defendants' plan for improved attorney access thus provides for exactly six and one-half hours of attorney visitation before some detainees will begin their "credible fear" interviews. This is insufficient time to provide attorney access that satisfies the requirements of due process. Thus, a TRO is necessary, despite Defendant's stated efforts to improve their policies and practices, in order to ensure that detainees will not begin their asylum proceedings with constitutionally inadequate access to their attorneys.

In addition, the Ninth Circuit has held that "an executive action that is not governed by any clear or codified procedures cannot moot a claim" and falls within the voluntary cessation exception. *McCormack v. Herzog*, 788 F.3d 1017, 1025 (9th Cir. 2015). Although Defendants' currently assert that they are now allowing the immigrant detainees sufficient due process and access to counsel, such informal policy changes are insufficient to meet the stringent standards of the voluntary cessation doctrine need to moot Plaintiffs' claims. *Id.*; *see also City of Mesquite*, 455 U.S. at 289 n.10. As the Ninth Circuit has advised, courts should be less inclined to find mootness where the "new policy . . . could be easily abandoned or altered in the future" and is not a "kind of permanent change." *Bell v. City of Boise*, 709 F.3d 890, 901 (9th Cir. 2013) (holding that the defendants "failed to meet their heavy burden to make it 'absolutely clear that the allegedly wrongful behavior . . . could not reasonably be expected to recur'" (quoting *Friends of the Earth*, 528 U.S. at 189)). Moreover, Defendants' acknowledged at the TRO hearing that

this is an "ever-changing" and "fluid" situation, which provides little guarantee that the policies currently in place will remain in place going forward.

**E. Bond**

Rule 65 of the Federal Rules of Civil Procedure directs that "[t]he court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). Federal courts, however, have discretion as to the amount of security and may even dispense with the security requirement altogether. *See Johnson v. Couturier*, 572 F.3d 1067, 1086 (9th Cir. 2009) ("'Rule 65(c) invests the district court with discretion as to the amount of security required, *if any.*'" (quoting *Jorgensen v. Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003))); *Save Our Sonoran, Inc. v. Flowers*, 408 F.3d 1113, 1126 (9th Cir. 2005) ("'The district court has discretion to dispense with the security requirement, or to request mere nominal security, where requiring security would effectively deny access to judicial review.'" (quoting *Cal. ex rel. Van De Kamp v. Tahoe Reg'l Planning Agency*, 766 F.2d 1319, 1325 (9th Cir. 1985))). The Court has considered the relative hardships and the likelihood of success on the merits and concludes that to require any security in this case would be unjust. Thus, the Court waives the requirement of a bond.

**TEMPORARY RESTRAINING ORDER**

**IT IS ORDERED** that Plaintiffs' Motion for Temporary Restraining Order is **GRANTED**, and until this Court orders otherwise and except as otherwise expressly permitted by this Temporary Restraining Order, for the next 28 days, or until such time as the parties agree in writing to amend, supersede, or terminate this TRO:

1. For all immigrant detainees currently housed at FDC Sheridan or who may become housed at FDC Sheridan during the pendency of this Order, Defendants shall not

proceed with any asylum interview or hearing, including any "credible fear" interview or screening, for such detainee, nor shall Defendants deport or remove any that detainee, until after that detainee has had a full and fair opportunity meaningfully to: (1) attend a "know your rights" training session conducted by Law Lab; and (2) if the detainee has requested representation from a Law Lab attorney or other legal counsel, consult with that attorney.

2.      For all immigrant detainees currently housed at FDC Sheridan or who may become housed at FDC Sheridan during the pendency of this Order, Defendants shall not transfer any such detainee outside of the District of Oregon without: (1) the consent of counsel for that detainee; or (2) prior leave of the Court.

3.      Defendants shall provide Law Lab's designated pro bono attorneys, or a detainee's otherwise designated counsel of choice, with access to at least two of FDC Sheridan's attorney visitation rooms for a minimum of six hours per day, seven days a week (*i.e*., including weekends), to perform group "know your rights" training as well as individualized interviews and consultations for the immigrant detainees at FDC Sheridan. In addition, Defendants shall make all reasonable efforts to ensure that the provided attorney visitation rooms are equipped with outside-line telephones that have speakerphone capability, to facilitate the attorney's consultation with a detainee who does not speak English by calling a telephone-accessible interpreter or interpretation service. Attorney calls may not be monitored, after Defendants are satisfied that the telephone call involves an attorney.

4.      Defendants shall install at least four telephone lines in each unit where immigrant detainees are held, with each line capable of placing free direct calls to legal service providers, including to Law Lab. Defendants shall permit all immigrant detainees housed at FDC Sheridan to access these telephones during facility "awake hours," or between 8:00 a.m. and 8:00 p.m.,

whichever is longer, each day of the week, including weekends. Attorney calls may not be monitored, after Defendants are satisfied that the telephone call involves an attorney.

5.      For all immigrant detainees currently housed at FDC Sheridan or who may become housed at FDC Sheridan during the pendency of this Order, Defendants shall provide timely advance written notice to the Office of the Federal Public Defender for the District of Oregon of any scheduled "credible fear" interview or screening or any other asylum interview at FDC Sheridan. In addition, after Defendants have been informed that a particular attorney or Law Lab represents a specific detainee, Defendants shall provide timely advance written notice to that attorney or Law Lab, as appropriate, of any scheduled "credible fear" interview or screening or any other asylum interview at FDC Sheridan for that detainee.

6.      Defendants shall allow attorneys to use laptops in accordance with BOP security guidelines while performing legal services on behalf of any immigrant detainee at FDC Sheridan.

7.      Defendants shall appropriately allocate ICE and BOP resources, including but not limited to personnel and equipment, sufficient to accommodate the expanded attorney visiting time and other requirements of this Order.

8.      The Court will hold a status conference on Monday, July 2, 2018, at 10:00 a.m. in Courtroom 15B of the Mark O. Hatfield United States Courthouse in Portland, Oregon. Any party seeking to modify any provision in this Order is requested to file a motion to amend not later than Sunday, July 1, 2018, at 12 noon. Among other things, at the status conference, the Court intends to set a hearing date for Plaintiffs' motion for preliminary injunction, as well as any other periodic status conference(s) that a party may propose.

**CONCLUSION**

Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction (ECF 2) is GRANTED as set forth in this Opinion and Order.

**IT IS SO ORDERED**.

DATED this 25th day of June, 2018 at 11:50 a.m.

/s/ Michael H. Simon
Michael H. Simon
United States District Judge