**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF OREGON**

| | |
|---|---|
| **INNOVATION LAW LAB and LUIS JAVIER SANCHEZ GONZALEZ by XOCHITL RAMOS VALENCIA as next friend,** | Case No. 3:18-cv-01098-SI |
| Plaintiffs-Petitioners, | **OPINION AND ORDER GRANTING PRELIMINARY INJUNCTION** |
| v. | |
| **KIRSTJEN NIELSEN, Secretary, Department of Homeland Security; THOMAS HOMAN, Acting Director, Immigration and Customs Enforcement (ICE); ELIZABETH GODFREY, Acting Field Office Director, Seattle Field Office of ICE; JEFFERSON BEAUREGARD SESSIONS, III, U.S. Attorney General; HUGH J. HURWITZ, Acting Director, Federal Bureau of Prisons; JOSIAS SALAZAR, Warden, FDC Sheridan Medium Security Prison; in their official capacities only,** | |
| Defendants-Respondents. | |

Keith Ketterling and Nadia H. Dahab, STOLL STOLL BERNE LOKTING & SHLACHTER PC, 209 SW Oak Street, Suite 500, Portland, OR 97204. Mathew W. dos Santos, Kelly K. Simon, and Leland Baxter-Neal, ACLU FOUNDATION OF OREGON, INC., P.O. Box 40585 Portland, OR 97240. Of Attorneys for Plaintiffs-Petitioners.

Billy J. Williams, United States Attorney, and Dianne Schweiner, Assistant United States Attorney, UNITED STATES ATTORNEY'S OFFICE FOR THE DISTRICT OF OREGON, 1000 SW Third Avenue, Suite 600, Portland, OR 97204. Chad A. Readler, Acting Assistant Attorney General; William C. Peachey, Director; Jeffrey S. Robins, Assistant Director; Anthony D. Bianco, Senior Litigation Counsel, and Ubaid ul-Haq, Trial Attorney, UNITED STATES DEPARTMENT OF JUSTICE, CIVIL DIVISION, OFFICE OF IMMIGRATION LITIGATION, P.O. Box 868, Ben Franklin Station, Washington, D.C. 20044. Of Attorneys for Defendants-Respondents.

Lisa Hay, Federal Public Defender; Stephen R. Sady, Chief Deputy Federal Defender, and Jessica Greenlick Snyder, Assistant Federal Public Defender, FEDERAL PUBLIC DEFENDER'S OFFICE FOR THE DISTRICT OF OREGON, 101 SW Main Street, Suite 1700, Portland, OR 97204. *Amica Curiae*.

**Michael H. Simon, District Judge.**

Plaintiffs, Innovation Law Law ("Law Lab") and Luis Javier Sanchez Gonzalez, by Xochitl Ramos Valencia as next friend ("Sanchez Gonzalez"), bring this action challenging certain actions taken by Defendants related to immigrant detainees held at the Federal Detention Center in Sheridan, Oregon ("FDC Sheridan"). Defendants are officials at the United States Department of Homeland Security ("DHS"), United States Immigration and Customs Enforcement ("ICE"), the Federal Bureau of Prisons ("BOP"), and the United States Department of Justice. On June 25, 2018, the Court granted Plaintiffs' motion for temporary restraining order ("TRO"), requiring Defendants to, among other things: (1) provide adequate attorney visitation and telephone access for immigrant detainees at FDC Sheridan; (2) permit Law Lab to conduct "know your rights" ("KYR") training for detainees; and (3) not proceed with interviews, cases, or deportations until after a detainee has had a full and fair opportunity meaningfully to consult with an attorney and attend KYR training conducted by Law Lab. Plaintiffs now seek a preliminary injunction, which Defendants oppose. A hearing on Plaintiffs' motion for

preliminary injunction was held on July 30, 2018. For the reasons stated below, Plaintiffs'
motion for preliminary injunction is granted.

## STANDARDS

A preliminary injunction is an "extraordinary remedy that may only be awarded upon a
clear showing that the plaintiff is entitled to such relief." *Winter v. Natural Res. Def. Council*,
555 U.S. 7, 22 (2008). A plaintiff seeking a preliminary injunction generally must show that:
(1) the plaintiff is likely to succeed on the merits; (2) the plaintiff is likely to suffer irreparable
harm in the absence of preliminary relief; (3) the balance of equities tips in favor of the plaintiff;
and (4) an injunction is in the public interest. *Winter*, 555 U.S. at 20 (rejecting the Ninth
Circuit's earlier rule that the mere "possibility" of irreparable harm, as opposed to its likelihood,
was sufficient, in some circumstances, to justify a preliminary injunction).

The Supreme Court's decision in *Winter*, however, did not disturb the Ninth Circuit's
alternative "serious questions" test. *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127,
1131-32 (9th Cir. 2011). Under this test, "'serious questions going to the merits' and a hardship
balance that tips sharply toward the plaintiff can support issuance of an injunction, assuming the
other two elements of the *Winter* test are also met." *Id.* at 1132. Thus, a temporary restraining
order or a preliminary injunction may be granted "if there is a likelihood of irreparable injury to
plaintiff; there are serious questions going to the merits; the balance of hardships tips sharply in
favor of the plaintiff; and the injunction is in the public interest." *M.R. v. Dreyfus*, 697 F.3d 706,
725 (9th Cir. 2012) (citing *Cottrell*).

Finally, the already high standard for granting a preliminary injunction is further
heightened when the type of injunction sought is a "mandatory injunction." *Garcia v. Google,
Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (noting that the burden is "doubly demanding" for a
mandatory injunction). To obtain a mandatory injunction, a plaintiff must "establish that the law

and facts *clearly favor* her position, not simply that she is likely to succeed." *Id.* (emphasis in original). As explained by the Ninth Circuit:

> A preliminary injunction can take two forms. A prohibitory injunction prohibits a party from taking action and "preserve[s] the status quo pending a determination of the action on the merits." *Chalk v. U.S. Dist. Court*, 840 F.2d 701, 704 (9th Cir. 1988); *see also Heckler v. Lopez*, 463 U.S. 1328, 1333 (1983) (a prohibitory injunction "freezes the positions of the parties until the court can hear the case on the merits"). A mandatory injunction orders a responsible party to take action. A mandatory injunction goes well beyond simply maintaining the status quo [p]endente lite [and] is particularly disfavored. In general, mandatory injunctions are not granted unless extreme or very serious damage will result and are not issued in doubtful cases or where the injury complained of is capable of compensation in damages.
>
> The *status quo ante litem* referenced in *Chalk* means the last, uncontested status which preceded the pending controversy.

*Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 878-79 (9th Cir. 2009) (quotation marks and citation omitted) (alterations in original).

## FINDINGS OF FACT

Based on the evidence presented by the parties, the Court finds the following facts are more likely true than not:

1.      On May 31, 2018, ICE transferred 124 immigrant men to FDC Sheridan for civil detention. ECF 14-1 (Newman Decl.) ¶ 4. Approximately 121 immigrant detainees remain at that location. *Id.* The detainees are housed in two units, at least one of which also houses inmates of the federal prison. *Id.* ¶ 6. Many of the detainees have come to the United States to request asylum. *See, e.g.*, ECF 3 (First Manning Decl.) ¶ 26; ECF 6 (Garcia Decl.) ¶ 5. Before June 25, 2018, both social and legal visits at FDC Sheridan took place each Monday through Friday from 8:30 until 11:30 a.m. for inmates and from 12:00 until 3:00 p.m. for immigrant detainees. ECF 14-1 (Newman Decl.). ¶ 8. Defendants add that they intended to provide legal visitation for all

pretrial/pre-sentence and civil detainees from 8:30 a.m. until 3:00 p.m, Monday through Friday, on a "first-come, first-served" basis by June 27, 2018. *Id.*

2.     Plaintiff Law Lab is a nonprofit organization founded by its executive director Stephen W. Manning that advocates on behalf of noncitizens in the United States. Law Lab provides representation to noncitizens, in part, through its Oregon-based network of 125 private, pro bono attorneys who have been trained in asylum and removal defense. ECF 3 (First Manning Decl.) ¶ 2. Law Lab, through Manning, designed a pro bono representation project to facilitate access to, and legal representation of, the FDC Sheridan immigrant detainees. Manning and Law Lab have previously run two similar detention-based pro bono representation projects. ECF 49 (Second Manning Decl.) ¶ 2. One of those projects, the Dilley Pro Bono Project in South Texas, has represented more than 40,000 noncitizens since its inception in 2015. *Id.* ¶ 4. Manning, in his role with Law Lab, has also collaborated with the Southern Poverty Law Center to design the model for a large-scale noncitizen representation project, and directs the Centers for Excellence—a pro bono project that provides technical and strategic assistance to noncitizens and their attorneys. *Id.* 2.

3.     Law Lab's pro bono representation project seeks to provide a minimum of three attorney contacts with each detainee who requests legal representation, consisting of: (1) a KYR group orientation that provides an overview of immigration relief; (2) an individualized screening with a trained advocate; and (3) an individualized client conference. Law Lab has determined that at least three know-your-rights orientations of 60 to 90 minutes duration is needed adequately to inform all interested FDC Sheridan immigrant detainees of their rights. ECF 3 (First Manning Decl.) ¶ 8. After beginning the pro bono project, approximately 900 community members, including immigration specialist attorneys, civil rights attorneys, and other

legal advocates have offered to provide pr bono legal services through Law Lab. ECF 49

(Second Manning Decl.) ¶ 9. Law Lab perceives that its ability to provide representation to the

immigrant detainees is limited only by the physical and temporal restrictions in place at FDC

Sheridan. *Id.*

4.      Between June 8 and June 21, 2018, Law Lab's pro bono attorneys requested, but

repeatedly were denied, access to the detained individuals for the purposes of delivering legal

services.  ECF 23 at 6-9; ECF 3 (First Manning Decl.) ¶ 12-17; 21-22; ECF 8 (Smith Decl.) ¶ 2-

10; ECF 9 (Strautman Decl.) ¶ 3-8; ECF 7 (Philbaum Decl.) ¶ 5-10; ECF 5 (Baxter-Neal Decl.)

¶ 5; ECF 4 (Sinlapasai Decl.) ¶ 12. In that time period, approximately 50 detainees had requested

representation from Law Lab. ECF 3 (First Manning Decl.) ¶ 25-27. Only one attorney had met

with a client, however, and that client was thereafter transferred from FDC Sheridan to the North

West Detention Center in Tacoma,

5.      Plaintiff Sanchez Gonzalez is currently detained at FDC Sheridan. He is unable to

file a complaint on his own due to lack of access to legal counsel. His domestic partner of ten

years, Xochitl Ramos Valencia, requested pro bono legal representation from Law Lab on his

behalf. Before June 25, 2018, Law Lab attorneys twice attempted to meet with Sanchez

Gonzalez but were denied access both times. ECF 3 (First Manning Decl.) ¶ 33-34.

6.      On June 22, 2018, Plaintiffs filed a complaint and a motion for TRO against

Defendants, alleging violations of the First and Fifth Amendments of the U.S. Constitution, the

Immigration and Nationality Act ("INA") and the Administrative Procedure Act ("APA"). At the

time Plaintiffs filed their complaint, removal proceedings for the 121 immigrant detainees at

FDC Sheridan had not yet commenced. Further, none of the immigrant detainees at FDC

Sheridan had been served with an administrative summons known as a "Notice to Appear,"

which is how a removal proceeding typically begins. ECF 27 (TRO Hearing Transcript) 5:20-25.

Before June 25, 2018, "Credible fear" interviews for immigrant detainees seeking asylum were

scheduled to begin at FDC Sheridan on June 28, 2018. ECF 14-2 (Heaton Decl.) ¶ 8.

7.      On June 25, 2018, the Court held a hearing on Plaintiffs' motion for TRO. The

Court granted the motion and entered the following order:

> 1.      For all immigrant detainees currently housed at FDC
> Sheridan or who may become housed at FDC Sheridan during the
> pendency of this Order, Defendants shall not proceed with any
> asylum interview or hearing, including any "credible fear"
> interview or screening, for such detainee, nor shall Defendants
> deport or remove any that detainee, until after that detainee has had
> a full and fair opportunity meaningfully to: (1) attend a "know
> your rights" training session conducted by Law Lab; and (2) if the
> detainee has requested representation from a Law Lab attorney or
> other legal counsel, consult with that attorney.
>
> 2.      For all immigrant detainees currently housed at FDC
> Sheridan or who may become housed at FDC Sheridan during the
> pendency of this Order, Defendants shall not transfer any such
> detainee outside of the District of Oregon without: (1) the consent
> of counsel for that detainee; or (2) prior leave of the Court.
>
> 3.      Defendants shall provide Law Lab's designated pro bono
> attorneys, or a detainee's otherwise designated counsel of choice,
> with access to at least two of FDC Sheridan's attorney visitation
> rooms for a minimum of six hours per day, seven days a week (*i.e.*,
> including weekends), to perform group "know your rights" training
> as well as individualized interviews and consultations for the
> immigrant detainees at FDC Sheridan. In addition, Defendants
> shall make all reasonable efforts to ensure that the provided
> attorney visitation rooms are equipped with outside-line telephones
> that have speakerphone capability, to facilitate the attorney's
> consultation with a detainee who does not speak English by calling
> a telephone-accessible interpreter or interpretation service.
> Attorney calls may not be monitored, after Defendants are satisfied
> that the telephone call involves an attorney.
>
> 4.      Defendants shall install at least four telephone lines in each
> unit where immigrant detainees are held, with each line capable of
> placing free direct calls to legal service providers, including to
> Law Lab. Defendants shall permit all immigrant detainees housed
> at FDC Sheridan to access these telephones during facility "awake

hours," or between 8:00 a.m. and 8:00 p.m., whichever is longer, each day of the week, including weekends. Attorney calls may not be monitored, after Defendants are satisfied that the telephone call involves an attorney.

5.      For all immigrant detainees currently housed at FDC Sheridan or who may become housed at FDC Sheridan during the pendency of this Order, Defendants shall provide timely advance written notice to the Office of the Federal Public Defender for the District of Oregon of any scheduled "credible fear" interview or screening or any other asylum interview at FDC Sheridan. In addition, after Defendants have been informed that a particular attorney or Law Lab represents a specific detainee, Defendants shall provide timely advance written notice to that attorney or Law Lab, as appropriate, of any scheduled "credible fear" interview or screening or any other asylum interview at FDC Sheridan for that detainee.

6.      Defendants shall allow attorneys to use laptops in accordance with BOP security guidelines while performing legal services on behalf of any immigrant detainee at FDC Sheridan.

7.      Defendants shall appropriately allocate ICE and BOP resources, including but not limited to personnel and equipment, sufficient to accommodate the expanded attorney visiting time and other requirements of this Order.

ECF 23 at 19-21.

8.      At subsequent status conferences, Plaintiffs and Defendants have generally reported good faith efforts to comply with the TRO and cooperate with one another. After the Court issued the TRO, Law Lab provided KYR presentations to 114 immigrant detainees, completed 100 initial client screenings, 95 client consultations, and 68 ancillary legal conferences.

9.      As of July 30, 2018, Law Lab represents 80 detainees at FDC Sheridan, each of whom was, at the time of their detention, subject to expedited removal under 8 U.S.C. § 1225(b)(1). Of Law Lab's 80 detainee clients, 79 have completed credible fear screening interviews under 8 U.S.C. § 1225(b)(1)(B) and one has withdrawn his screening request at the

interview. Of the 79 detainee clients who have completed credible fear interviews, 74 have received determinations. All 74 detainee clients of Law Lab who have received determinations, including Plaintiff Gonzalez, have been determined by an asylum officer to have a credible or reasonable fear of persecution. The determinations for the other five detainee clients remain outstanding.

10.     Law Lab continues to provide representation to its client detainees who have received positive fear determinations to assist those detainees with their petitions for release pending adjudication of their asylum applications. Plaintiffs now seek a preliminary injunction limited to issues affecting the ability of Law Lab attorneys to continue to deliver legal services to its client detainees at FDC Sheridan. Plaintiffs no longer seek an order enjoining Defendants from moving forward with removal proceedings or asylum hearings.

## CONCLUSIONS OF LAW

### A.  Subject Matter Jurisdiction

Defendants argue that the INA, as amended, removes subject matter jurisdiction from federal district courts to provide relief for all detainees, whether they are subject to expedited removal under 8 U.S.C. § 1225(b)(1) or other formal immigration proceedings before an immigration judge. The jurisdiction-stripping provisions of 8 U.S.C. § 1252(a)(2)(A) and 8 U.S.C. § 1252(e) apply only to detainees subject to expedited removal proceeding under § 1225(b)(1). Although all of Law Lab's clients were subject to expedited removal proceedings at the time of their detention, all but one of their clients has since completed an credible fear interview as provided under § 1225(b)(1)(B). Five of those detainee clients' credible fear determinations remain outstanding, but of the 74 determinations that have been made, every detainee client has received a positive fear determination. Thus, these 74 detainees are now permitted to pursue their asylum application under 8 U.S.C. § 1158 before an immigration judge

and, if removal proceedings are commenced, will be subject to formal, rather than expedited, removal proceedings under 8 U.S.C. § 1229a before an immigration judge. At this stage in the litigation, therefore, essentially all of the detainee clients are no longer subject to the provisions of § 1225(b)(1). The jurisdiction-stripping provisions of § 1252(a)(2)(A) and § 1252(e) are thus inapplicable.[1]

Defendants argue that the detainees who are no longer subject to expedited removal nevertheless bring claims that arise from their removal proceedings, and that such claims are therefore barred by § 1252(b)(9) and (g). Under 8 U.S.C. § 1252(b)(9), "claims that 'arise from' removal proceedings . . . must be channeled through the [petition for review] process." *J.E.F.M.*

---

[1] If any of the five detainee clients whose fear determinations remain outstanding are found to lack credible or reasonable fear of prosecution, Defendants may file a motion for reconsideration. The Court notes, however, that § 1252(a)(2)(A) and 8 U.S.C. § 1252(e) likely do not strip the Court of jurisdiction over Plaintiffs' request for relief even if some detainee clients remain subject to the provisions of § 1251(b)(1). Plaintiffs do not challenge any determination made pursuant to § 1225(b)(1), nor Defendants' decision to invoke that section's provisions. Thus, § 1252(a)(2)(A)(i)-(iii), which bars courts from reviewing such decisions and determinations, has no effect on jurisdiction in this case.

Similarly, § 1252(a)(2)(A)(iv) does not bar review of this lawsuit because Defendants do not challenge "procedures and policies adopted" to implement the provisions of § 1251(b)(1). In the administrative law context, "procedures" and "policies" generally refer to those internal regulations to which an agency may be bound. *See Morton v. Ruiz*, 415 U.S. 199, 235 (1974) ("Where the rights of individuals are affected, it is incumbent upon agencies to follow their own procedures."); *see also Alcaraz v. I.N.S.*, 384 F.3d at 1150, 1162 (9th Cir. 2004) (noting that certain memoranda issued by an agency may not "establish a policy to which the agency was bound").

In this lawsuit, Plaintiffs challenge only specific actions at FDC Sheridan that conflict with the very procedures and policies that Defendants—specifically, ICE—have adopted. ICE's operations manual "Performance-Based National Detention Standards 2011" ("PBNDS 2011") guarantees to detainees a certain degree of access to immigration attorneys. Plaintiffs allege that Defendants have failed to meet these adopted "policies and procedures" in violation of 5 U.S.C. § 706(2)(A). Thus, rather than challenge "procedures and policies" that Defendants have adopted to implement § 1225(b)(1), Plaintiffs seek to *enforce* the adopted procedures and policies. For the same reason, § 1252(e)(3), which requires that challenges to agency regulations, written policies, and written procedures be heard in the U.S. District Court for the District of Columbia, does not affect the Court's jurisdiction over this claim. Plaintiff's claims raise no such challenge.

*v. Lynch*, 837 F.3d 1026, 1032 (9th Cir. 2016). In addition, when claims are "inextricably linked" to removal proceedings, they may not be heard by federal district courts. *Martinez v. Napolitano*, 704 F.3d 620, 623 (9th Cir. 2012). Such claims may be raised only before a federal circuit court on a petition for review ("PFR") of a final removal order. *J.E.F.M.*, 837 F.3d at 1032. Under 8 U.S.C. § 1252(g), federal courts also lack jurisdiction to hear challenges to the Attorney General's "decision or action to commence [removal] proceedings, adjudicate cases, or execute removal orders." *Reno v. American-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 482 (1999). "[C]laims that are independent of or collateral to the removal process," however, are excluded from the PFR process and, thus, may be heard in federal district courts. *Id.; see also Nadarajah v. Gonzales*, 443 F.3d 1069, 1075-76 (9th Cir. 2006) (holding that the district court had jurisdiction over a habeas corpus petition when the petition did not involve a final order of removal).

In *J.E.F.M.*, the Ninth Circuit held that the district court lacked subject matter jurisdiction over immigrant children's claims to court-appointed counsel because such claims arose from removal proceedings. 837 F.3d at 1033. The Ninth Circuit noted that such claims are "bound up in and an inextricable part of the administrative process." *Id.* The court also observed that the jurisdiction-stripping provisions of the INA were intended to "channel all claims arising from removal proceedings, including right-to-counsel claims, to the federal courts of appeals and bypass the district courts." *Id.*

In the pending case, however, Plaintiffs do not challenge the detainees' removal proceedings because formal removal proceedings under 8 U.S.C. § 1229a have not yet commenced. *See* ECF 27 (TRO Hearing Transcript) 5:20-25; 33:8-10. Rather, Plaintiffs challenge ICE and BOP actions relating to the conditions of the civil immigrant detainees' pre-

hearing confinement. *J.E.F.M.* did not address whether district courts have jurisdiction over constitutional claims by immigrant detainees whose removal proceedings have not yet commenced. In fact, the district court in *J.E.F.M.* had already dismissed all parties "against whom removal proceedings have not yet been initiated," explaining that their claims for court-appointed counsel in removal proceedings were not ripe because their "removal proceedings may never be commenced." *Id.* at 1030. The Ninth Circuit's ruling in *J.E.F.M.*, therefore, does not preclude this Court from hearing claims from civil immigrant detainees whose removal proceedings have not yet been initiated.

Moreover, in the recent Supreme Court decision in *Jennings v. Rodriquez*, five members of the Court agreed that 8 U.S.C. § 1252(b)(9) does not deprive a district court of jurisdiction to hear a challenge to an alien's indefinite detention, even when the purpose of the detention is to lead ultimately to removal proceedings. 138 S. Ct. 830, 840 (2018) (opinion of the Court); *see also* 138 S. Ct. at 874 ( Breyer, J. dissenting). Chief Justice Roberts and Justice Kennedy joined Part II of the opinion of the Court in *Jennings*, in which they declined to interpret the phrase "arising from removal proceedings" in an "extreme way" that would make certain circumstances of pre-hearing detention "effective unreviewable." *Id.* The justices concluded that when immigrant detainees are not challenging a removal order, or the decision to detain them, or "any part of the process by which their removability will be determined[,] . . . § 1252(b)(9) does not present a jurisdictional bar." *Id.* at 841. Justice Breyer's dissent in *Jennings*, joined by Justices Ginsburg and Sotomayor, concluded that § 1252(b)(9) poses a jurisdictional bar only to challenges to orders of removal. *Id.* at 874 (Breyer, J. dissenting). Five justices, therefore, agree that the mere fact that a noncitizen has been detained, even if that detention is an "action taken

'to remove an alien,'" *id.* at 841 n. 3, does not mean that § 1252(b)(9) presents a jurisdictional bar to the all claims arising from the circumstances of that detention.[2]

The *Jennings* decision relied in part upon the earlier Supreme Court decision *Reno v. American-Arab Anti-Discrimination Committee*, in which the Court had given a similarly limiting interpretation to § 1252(g). 525 U.S. 471, 482 (1999). In *American-Arab*, the Court held that § 1252(g) does not strip federal courts of jurisdiction over any claims other than those that challenged the three listed actions in the statute: the decision to commence removal proceedings, adjudicate cases, or execute removal orders. *Id.* at 482-83. In the pending case, Plaintiffs do not challenge any such decision or action. Indeed, they cannot, as no removal proceeding has yet begun and no removal decision has yet been made. Defendants argue that the very fact of the detainees' detention means that removal proceedings have been initiated, and thus claims arising from the circumstances of the detainees' confinement arise from the decision to initiate removal proceedings. The Supreme Court, however, rejected this argument in *Jennings*, writing "[w]e will assume for the sake of argument that detention is an action taken 'to remove an alien' . . . [but t]he question is not whether *detention* is an action taken to remove an alien but whether the *legal questions* in this case arise from such an action." *Jennings*, 128 S.Ct.at 841 n. 3. As with the legal question regarding an alien's indefinite detention in *Jennings*, the legal questions regarding detainees' access to their retained counsel in this case are "too remote" from removal proceedings to fall within the scope of § 1252(b)(9) or (g).

_____

[2] Justice Kagan took no part in the decision and Justice Alito did not join Part II of the opinion of the Court. Justice Thomas wrote in a concurring opinion, joined by Justice Gorsuch, that § 1252(b)(9) posed a jurisdictional bar to the respondents' claim of indefinite detention.

**B. Standing**

Defendant argues that the requested preliminary injunction is overbroad because neither Gonzalez nor Law Lab has standing to litigate on behalf of other detainees at FDC Sheridan who are not parties to this lawsuit. To bring an action on the behalf of third parties:

> [t]he litigant must have suffered an 'injury in fact,' thus giving him or her a 'sufficiently concrete interest' in the outcome of the issue in dispute; the litigant must have a close relation to the third party; and there must exist some hindrance to the third party's ability to protect his or her own interests.

*Powers v. Ohio*, 499 U.S. 400, 410-11 (1991).

Law Lab meets these requirements. Law Lab's stated mission is to advocate on behalf of and provide legal representation to noncitizens in the United States. In furtherance of this mission, they have undertaken considerable effort to provide pro bono legal representation to the FDC Sheridan immigrant detainees. The alleged policies, procedures, and actions at FDC Sheridan, however, have prevented Law Lab from fulfilling its mission of advocating on behalf of noncitizens, and render futile its efforts to coordinate pro bono legal representation. The challenged policies and procedures also have resulted in the diversion of Law Lab resources, as attorneys have repeatedly traveled to FDC Sheridan only to be turned away, and have established a toll-free hotline for detainees that detainees have not been able to access or use. Such facts sufficiently establish that Law Lab has suffered injury in fact.

Plaintiffs also have demonstrated that Law Lab has a sufficiently close relationship with the detainees to advocate on their behalf. Plaintiffs have submitted affidavits indicating that at least 50 detainees at FDC Sheridan have requested representation from Law Lab. The Federal Public Defender ("FPD"), as *amica curiae*, also states that at least 64 detainees have communicated their requests for immigration representation, which the FPD cannot provide, to FPD staff attorneys. ECF 18. These numerous requests from immigrant civil detainees and FDC

Sheridan sufficiently demonstrate that Law Lab has a close relation to the detainees, even if

Defendants' actions have prevented Law Lab attorneys from formalizing their legal relationship

with many of those detainees. Further the circumstances of the detainees' confinement—

specifically, the lack of access to immigration lawyers that forms the foundation of this case—

poses a significant hindrance to the detainees' ability to advocate on their own behalf, as do the

foreign language barriers faced by many of the civil detainees. Finally, counsel for Plaintiff Law

Lab states, and counsel for Defendants do not dispute, that Law Lab currently represents 80 of

the detainees at FDC Sheridan. As Law Lab has explained, it seeks preliminary injunctive relief

only on behalf of itself and its 80 detainee clients.[3]

## C. Analysis of Motion for Preliminary Injunction

### 1. Likelihood of Success on the Merits

Plaintiffs have shown a likelihood of success on the merits of their first claim, which

alleges a violation of the APA, and their third claim, which alleges a violation of the Due Process

Clause of the Fifth Amendment. Accordingly, the Court need not decide at this stage of the

---

[3] Plaintiffs originally requested preliminary relief on behalf of "all immigrant detainees currently housed at FDC Sheridan or who may become housed at FDC Sheridan during the pendency of this Order." ECF 48 at 21, 22. This request goes too far. First, Plaintiffs do not have standing to request an order affecting all current or future detainees at FDC Sheridan because some of those detainees have retained counsel not associated with Law Lab. Plaintiffs have standing to request relief that applies only to those immigrant detainees at FDC Sheridan who have either requested pro bono representation and are not already represented, or who are already represented by a Law Lab attorney. Second, for reasons explained in the earlier section, this Court lacks jurisdiction to prevent the transfer or removal of immigrant detainees who have been ordered removed under 8 U.S.C. § 1225(b)(1)(A)(i) or (B)(iii). Thus, Plaintiffs cannot obtain preliminary relief that restricts Defendants from transferring or removing immigrant detainees who are subject to expedited removal and have not requested asylum, or those who have requested asylum but have been found not to have a credible fear of persecution. Plaintiffs, however, have limited their requested relief, and subject to these modifications and clarifications, Plaintiffs have established that they have standing in this case sufficient to obtain the modified relief that they seek.

litigation whether Plaintiffs have shown a likelihood of success on the merits of their other constitutional and statutory claims.

### a. Administrative Procedure Act

Plaintiffs have demonstrated a likelihood of success on the merits of their first claim, which alleges a violation of the APA, 5 U.S.C. § 706(2)(A). Under the APA, reviewing courts must "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary [or] capricious." 5 U.S.C. § 706(2)(A). It is arbitrary and capricious for agencies to depart from prior policy without explanation or "simply disregard rules that are still on the books." *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). The principle that agencies must adhere to their own rules extends to both formal agency regulations and informal internal agency rules. *Alcaraz v. I.N.S.*, 384 F.3d 1150, 1162 (9th Cir. 2004). In their opposition to Plaintiffs' motion for preliminary injunction, Defendants make no argument that Plaintiffs' APA claim is unlikely to succeed on the merits.

ICE's operations manual "PBNDS 2011" provides that "[d]etainees shall be able to make free calls to the ICE/ERO-provided list of free legal service providers for the purpose of obtaining initial legal representation." PBNDS 2011 5.6.II.7. The manual further provides that "[d]etainees shall be able to communicate and correspond with representatives from [authorized] legal groups that make presentations at the facilities." *Id.* at 6.4.II.5. Presentation on detainees' rights and U.S. immigration law and procedures are "encourage[d]." *Id.* at 6.4.I. ICE's detention standards also require that facilities "permit legal visitation seven days a week, including holidays, for a minimum of eight hours per day on regular business days . . . and a minimum of four hours per day on weekends and holidays." *Id.* at 5.7.J.2. The Bureau of Prisons' standards also require attorney visits to be available each day of the week for pretrial inmates, which includes "deportable aliens." BOP Policy re Pretrial Inmates, 7331.04.

Plaintiffs have presented substantial evidence that immigrant detainees at FDC Sheridan are not able to make free calls to legal service providers and have been denied access to know-your-rights training, despite the Law Lab seeking and obtaining approval for such trainings from the relevant ICE authorities. Plaintiffs have also presented substantial evidence that detainees at FDC Sheridan are permitted legal visitation on a far more restricted basis than both BOP and ICE standards require. FDC Sheridan officials instructed attorneys with the Law Lab that legal visitation was available only on Tuesday, Wednesdays, and Fridays, from 12:30-3:00 p.m. Officials at FDC Sheridan turned away attorneys attempting to meet with detainees at FDC Sheridan on other days of the week. Such evidence demonstrates compellingly that both BOP and ICE are violating the APA by "simply disregard[ing] rules that are still on the books."

### b. Due Process Clause

The Due Process Clause of the Fifth Amendment guarantees to aliens the right to counsel at their own expense for immigration hearings. *See, e.g., Tawadrus v. Ashcroft*, 364 F.3d 1099, 1103 (9th Cir. 2004) ("Although there is no *Sixth Amendment* right to counsel in an immigration hearing, Congress has recognized it among the rights stemming from the *Fifth Amendment* guarantee of due process that adhere to individuals that are subject to removal hearings.") (emphasis added); *Colindres-Aguilar v. INS*, 819 F.2d 259, 261 n.1 (9th Cir. 1987) ("Petitioner's right to counsel . . . is a right protected by the fifth amendment due process requirement of a full and fair hearing."). The INA also guarantees noncitizens the right to counsel of their choosing, at their own expense, in removal proceedings. 8 U.S.C. § 1362; 8 U.S.C. § 1229a(b)(4)(A). Similarly, the INA provides that those subject to expedited removal who are eligible for credible fear interviews "may consult with a person or persons of the alien's choosing prior to the interview or any review thereof." 8 U.S.C. § 1225(b)(1)(B)(iv). The Ninth Circuit has described the INA provisions guaranteeing counsel as making explicit the Fifth Amendment due process

guarantee to aliens' counsel of their choice at their own expense in immigration proceedings.

*Rios-Berrios v. I.N.S.*, 776 F.2d 859, 862 (9th Cir. 1985).

The right to counsel in immigration proceedings, including asylum proceedings, requires

that an alien be provided "reasonable time to locate counsel and permit counsel to prepare for the

hearing." *Biwot v. Gonzales*, 403 F.3d 1094, 1098 (9th Cir. 2005); *see also* 8 U.S.C. § 1158(d)(4)

("At the time of filing an application for asylum, the Attorney General shall . . . advise the alien

of the privilege of being represented by counsel"). The Ninth Circuit has upheld mandatory

injunctions designed to remedy government practices when the "cumulative effect" of such

practices "was to prevent aliens from contacting counsel and receiving any legal advice."

*Orantes-Hernandez v. Thornburgh*, 919 F.2d 549, 565 (9th Cir. 1990). Government practices

that effectively deny access to counsel include the detention of aliens far from where potential or

existing counsel was located, limited attorney visitation hours, and the processing of aliens at

locations where telephones were not available to them. *Id.* at 565-67.

Plaintiffs have presented sufficient evidence of government practices at FDC Sheridan

that are nearly identical to the enjoined practices at issue in *Orantes-Hernandez*. Attorneys

associated with Law Lab's immigrant detainee representation project have been repeatedly

denied access to FDC Sheridan either to perform KYR training or to meet with clients who have

retained their services through friends and family. Officials at FDC Sheridan have given

conflicting and nearly-impossible-to-follow instructions on the availability of legal visitation

hours. *See also Nunez v. Bolden*, 537 F. Supp. 578, 582 (S.D. Tex. 1982) (holding that a

detention facility regulation prohibiting attorney visits after 3:30 p.m. was unreasonably

restrictive, given the remoteness of the detention facility). As with the enjoined practices at issue

in *Orantes-Hernandez*, the BOP and ICE attorney visitation policies and practices have the "cumulative effect" of denying detainees constitutionally sufficient access to legal assistance.[4]

Plaintiffs have demonstrated not only a likelihood of success on the merits of their Fifth Amendment due process claim, as required for prohibitory injunctions, but that "the law and facts *clearly favor* [their] position," as required to obtain a mandatory injunction. *Garcia*, 786 F.3d at 740 (emphasis added). Moreover, at the very least, Plaintiffs have presented serious questions going to the merits of their Due Process claim which, so long as the equities tip sharply in Plaintiffs' favor, which they do, is sufficient to satisfy this component of the preliminary injunction analysis in the Ninth Circuit. *See Cottrell*, 632 F.3d at 1131-32.

## 2. Irreparable Harm, Equities, and Public Interest

Plaintiffs also have made a compelling demonstration that they are likely to suffer immediate irreparable harm in the absence of emergency relief. The Court has concluded that Defendants are likely violating the immigrant detainees' constitutional rights, and such violations "unquestionably constitute[] irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). The harms likely to arise from the denial of access to legal representation in the context of asylum applications are particularly concrete and irreparable. The Ninth Circuit has repeatedly emphasized the complexity of immigration laws and procedures and the difficulty of navigating immigration proceedings without a lawyer. *See, e.g., Baltazar-Alcazar v. I.N.S.*, 386 F.3d 940, 948 (9th Cir. 2004). The denial of access to legal assistance is likely to lead to the denial of asylum and ultimately to the deportation of detainees with meritorious asylum claims. Early

---

[4] Defendants urge the Court to apply the three-part balancing test of *Matthews v. Eldridge*, 424 U.S. 319 (1976), in reviewing Plaintiff's Due Process claim. Application of such a test is unnecessary, however, as binding Ninth Circuit case law has already made clear that immigrant detainees have a due process right to meaningful access to counsel. The Court thus need not conduct an analysis of the sufficiency of process anew. If Plaintiffs were denied meaningful access to counsel, such a deprivation was insufficient process as a matter of law.

representation is particularly important in asylum claims, given the complexity of treaty-based human rights statutes and the serious harm—including persecution, torture, and death—that may result if asylum is improperly denied. *See Arizona v. United States*, 567 U.S. 387, 395 (2012) ("Federal governance of immigration and alien status is extensive and complex."); *Sessions v. Dimaya*, 138 S. Ct. 1204, 1213 (2018) (noting in the void-for-vagueness context the "grave nature of deportation," a "drastic measure" often amounting to lifelong "banishment or exile").

Defendants, however, argue that issuance of this preliminary injunction will disrupt the prompt execution of the expedited removal process, in which the government and the public have a strong interest. Nothing in Plaintiffs' requested relief, however, prevents Defendants from carrying out the provisions of 8 U.S.C. § 1225(b)(1) as the statute contemplates. Any detainee at FDC Sheridan who is subject to expedited removal who does not express an intent to apply for asylum may be removed "without further hearing or review" under § 1225(b)(1)(A)(i). Similarly, any detainee at FDC Sheridan who requests asylum, but is found not to have a credible fear of persecution following his screening interview may be removed "without further hearing or review" under § 1224(b)(1)(B)(iii), subject to the limitations of subclauses (I)-(IV) of that section. The requested relief merely ensures that those detainees with a right to counsel who have retained or requested counsel through Law Lab are ensured the same degree of access to that counsel that Defendants' own policies guarantee in PBNDS 2011. The preliminary relief, as ordered by the Court creates no loophole and imposes no new impediments to the expeditious functioning of 8 U.S.C. § 1225(b)(1).

The equities in this case also tip sharply in favor of emergency relief for the Plaintiffs. They request only that BOP and ICE actually provide the same degree of access to legal assistance that their own regulations purport to guarantee. Thus, Defendants do not persuasively

show that the requested preliminary relief will pose an undue burden on Defendants' time, resources, or personnel. Moreover, any such burden on Defendants is more than justified by the need to ensure the fulfillment of Plaintiffs' constitutional rights and to prevent the improper denial of meritorious asylum applications. Finally, it is always in the public interest to prevent the violation of a party's constitutional rights.

## D. Bond

Rule 65 of the Federal Rules of Civil Procedure directs that "[t]he court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). Federal courts, however, have discretion as to the amount of security and may even dispense with the security requirement altogether. *See Johnson v. Couturier*, 572 F.3d 1067, 1086 (9th Cir. 2009) ("'Rule 65(c) invests the district court with discretion as to the amount of security required, *if any.*'" (quoting *Jorgensen v. Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003))); *Save Our Sonoran, Inc. v. Flowers*, 408 F.3d 1113, 1126 (9th Cir. 2005) ("'The district court has discretion to dispense with the security requirement, or to request mere nominal security, where requiring security would effectively deny access to judicial review.'" (quoting *Cal. ex rel. Van De Kamp v. Tahoe Reg'l Planning Agency*, 766 F.2d 1319, 1325 (9th Cir. 1985))). The Court has considered the relative hardships and the likelihood of success on the merits and concludes that to require any security in this case would be unjust. Thus, the Court waives the requirement of a bond.

## PRELIMINARY INJUNCTION

**IT IS ORDERED** that Plaintiffs' Motion for Preliminary Injunction is **GRANTED**, and until this Court orders otherwise and except as otherwise expressly permitted by this Preliminary

Injunction, or until such time as the parties agree in writing to amend, supersede, or terminate this Preliminary Injunction:

1.     Defendants shall not transfer any detainee represented by Law Lab outside of the District of Oregon without either (1) the consent of counsel for that detainee or (2) prior leave of the Court.

2.     Defendants shall provide Law Lab's designated pro bono attorneys with access to at least two of FDC Sheridan's attorney visitation rooms for a minimum of six hours per day, seven days a week (*i.e.*, including weekends), to conduct individualized interviews and consultations for all immigrant detainees at FDC Sheridan who have retained pro bono representation through Law Lab. In addition, Defendants shall make all reasonable efforts to ensure that the provided attorney visitation rooms are equipped with outside-line telephones that have speakerphone capability, adequate to facilitate the attorney's consultation with a detainee who does not speak English by calling a telephone-accessible interpreter or interpretation service. Attorney calls may not be monitored after Defendants are satisfied that the telephone call involves an attorney.

3.     Defendants shall continue to make available to Law Lab's client detainees at least two telephone lines in each unit where immigrant detainees are held, with each line capable of placing free direct calls to legal service providers, including to Law Lab. Defendants shall permit all Law Lab client detainees housed at FDC Sheridan to access these telephones during facility "awake hours," or between 8:00 a.m. and 8:00 p.m., whichever is longer, each day of the week, including weekends. Attorney calls may not be monitored, after Defendants are satisfied that the telephone call involves an attorney.

4.      For all detainees at FDC Sheridan represented by Law Lab, Defendants shall provide timely advance written notice to the detainees' counsel of record of any scheduled credible or reasonable fear interview or screening or any other immigration-related interview at FDC Sheridan.

5.      The Court will hold periodic status conferences to monitor compliance with this Order and to determine whether any preliminary relief ordered should be modified or discontinued. The next status conference will be on **Monday, August 13, 2018, at 10:00 a.m. Pacific time** in Courtroom 15B of the Mark O. Hatfield United States Courthouse in Portland, Oregon. Any party seeking to modify any provision in this Order is requested to file such a motion not later than two business days before the next conference, unless an earlier decision is needed.

## CONCLUSION

Plaintiff's Motion for Preliminary Injunction (ECF 48) is GRANTED as set forth in this Opinion and Order.

**IT IS SO ORDERED**.

DATED this 31st day of July, 2018.

*/s/ Michael H. Simon*
Michael H. Simon
United States District Judge